MARINE RUFFNER *v*. THE BOARD OF COMMISSIONERS OF HAMILTON COUNTY, AND JOHN HAWKINS.

1. The decision of a court, overruling a demurrer to the petition, may be assigned for error, although no exception thereto appears in the record.

2. A citizen of the county may maintain an action in his own name, in behalf of himself and other citizens, whether a tax-payer or not, to restrain the county commissioners from the performance of acts which are fraudulent, in breach of their trust, or in excess of their power.

3. A law passed in the year 1848, prescribing the mode in which the commissioners of this county shall make contracts, is not of a *general nature*, and is therefore not inconsistent with the present constitution of the State, by reason of its not having an *uniform operation* throughout the State, so as to be repealed by implication.

4. Acquiescence in, or consent to, the alleged illegal acts of the defendants on the part of the plaintiff, would bar his right to an injunction, but it is matter of defense, which must be set up and relied on by the defendants at the hearing, in order to be made available.

GENERAL TERM.—Proceeding in error to reverse a judgment rendered for plaintiff in error, at special term of June, A. D. 1855, heretofore reported on p. 39 *ante.*

The petition, in this case, was filed by Marine Ruffner, describing himself as a tax-payer of Hamilton county, and also one of the three members of the board of county commissioners, and suing, as well for himself, as the other tax-payers of Hamilton county, who are too numerous to be made parties. The petition states that the board *are erecting* a public building—an asylum for the insane—near Carthage, in Hamilton county; that two of the commissioners entered into a contract with the defendant, Hawkins, to do the brick-work on the buildings; that the plaintiff knew nothing of this contract, and that he had entered a protest against it as illegal and fraudulent.

The petition states that the contract is indefinite as to the amount of brick to be furnished, and when the work is to be done; that notice of the intention to contract was not given; that the price agreed to be given was exorbitant; that other persons are ready and willing to do the work at a less price, and that there will be a loss to the tax-payers of $10,000.

An amended petition was filed, which states that the contract is for the erection of a public building, by which a larger expense is involved than $5,000, and that the county commissioners have not submitted the question of the policy of such expense to the qualified voters of said county. It appears that an act of the legislature, passed in the year 1848, required such a submission, and declared invalid any contracts made when it was not done.

The prayer of the petition is for an injunction to restrain any proceedings under the contract, and for its rescission.

To the petition and amended petition, the board of county commissioners filed answers. The defendant, John Hawkins, demurred to the amended petition.

At the June term, 1855, the action was submitted on the petition, answers, demurrer, and proof, and a judgment was entered at special term. The court found that the contract was for the erection of a public building, exceeding in cost $5,000, and that the act of 1848 not having been complied with, the contract was void. A perpetual injunction against any further proceedings, or any payment under the contract, was therefore granted, and judgment rendered for the costs of the action in favor of the plaintiff. To the finding and decision, no exception was taken, either by a bill of exceptions, or by an entry at the end of the decision.

*Walker, Kebler & Force,* for plaintiff in error.

*Worthington & Matthews,* and *Geo. E. Pugh,* for county commissioners.

GHOLSON, J., delivered the opinion of the court.

The first matter to be considered is, what questions are presented by the record for decision? Under the former system of practice, the proceedings to revise errors in courts of law and in courts of equity were different. In a court of equity, there was, properly, no such thing as taking an exception to the decision of the court. Nor in a court of law was any other mode of exception known than that by bill of exceptions—the object of which was to bring the supposed matter of error into the record. Where the matter of error appeared on the face of the record, the party prejudiced thereby had the right to avail himself of such error. In a court of equity, the remedy was by a bill of review; in a court of law, by a writ of error.

By our code, the distinction between suits at law and in equity is abolished, and one common mode of taking advantage of error in the decisions of courts is provided. The

code, therefore, must be our guide in determining what questions are presented by a record for the decision of a court of error.

It can not well be doubted that there may be errors on the record, since, as before the code, which a court of error will revise, though no exception be noted. Article V, Chapter II, of Title IX, of the Code, is to be limited to the subject-matter. The title and chapter are headed "Trial." Article 1—Trial in General. Article 2—Trials by Jury. Article 3 —Trials by the Court. Article 4—Trials by Referees. Article 5—Exceptions. Article 6—New Trials. Article 7— General Provisions. Article 8—Time of Trial. Now, the exceptions referred to under article 5 would appear to be those connected with a trial, either before a court and jury by the court alone, or by referees; and, although a trial, as appears by Chapter I of the title, headed "Issue," embraces the trial of issues of law and of fact, yet the issues of law here meant are not those arising on a demurrer to the petition. They had been provided for by previous sections. The issues here meant, and the trial, have reference to the disposition of the case after the pleadings have been completed, to controvert issues of law and fact. As no demurrer was allowed to an answer, this rule would, in most instances, involve issues of law and fact.

The term "exception," therefore, in sections 290, 291, 292, 293, and 294, of the code, is to be controlled by the application of the rule "noscitur a sociis." The decision of the court, in sections 290 and 291, means a decision upon a trial. It does not refer to a decision upon a demurrer, or other decision not occurring upon the trial, or connected with the trial, as in the case of an application for a new trial under the succeeding chapter. It could not, of course, refer to an error in a judgment rendered without appearance, or in a proceeding after the end of the term, where there might have been no opportunity to except to the decision.

Under this view, it is scarcely necessary to say, that the only matter to be considered in this case arises on the

demurrer of one of the defendants.   No exception was noted at the end of the decision.   If the findings of the court were made under section 280 of the code, to such a case the provision of section 290 must surely apply.

The demurrer to the amended petition should properly have been disposed of by a distinct entry before the final hearing of the case; on which hearing, there being no answer, the matters in the petition would be considered as true; but, substantially, the demurrer was overruled, and the question is, whether the facts stated in the petition entitled the plaintiff to the relief sought and obtained.

Upon this question two important matters are to be considered—first, as to the right of the plaintiff to sue; and, secondly, as a question of law, whether the contract, admitting the statement in the amended petition to be true, was illegal?

As to the right of the plaintiff to sue: In substance, I understand the plaintiff to come before us as one of a number of corporators, complaining of the acts of those constituting the acting authority, or governing body of the corporation.   If the county of Hamilton constitutes a corporation, under the name of the county commissioners, then the citizens of the county must be deemed the corporators. If individual action, on the part of a corporator, can interfere with the action of regularly constituted corporate authority, undoubtedly a proper mode of suit is by one corporator in behalf of the others.   In this view, it would, perhaps, make no difference whether the corporator was a tax-payer, or not; his being a tax-payer, certainly does not diminish his right to sue.   It is true, it might have been made an objection, that the non-tax-paying citizens, being also corporators, should have been parties; but this is not pointed out as a ground of demurrer.   The only question is, can the plaintiff alone, or in connection with any other parties, obtain relief?

To my mind it is a matter of grave doubt whether the county commissioners constitute any such corporation, or

whether the citizens of the county can be deemed, in any proper sense, corporators. But if the county commissioners act for the county in such a mode, that the county is responsible for fraud or acts of negligence within the scope of their authority, for their breach or omission of duty as to matters of public concern, then necessity would seem to require that the citizens should have the same right of restraint as other corporators have in like cases. Now both these questions appear to be settled by our Supreme Court. First, that the county is so responsible, as a corporation, represented by the county commissioners. This was conceded by this court in the case of *Mighels* v. *The County Commissioners*, upon the authority of 2 Ohio, 348, *Commissioners of Brown County* v. *Butt.* Secondly, that corporators may maintain a suit against the directors, or governing body, for fraud, breach of trust, and excess of power, seems to have been decided in 5 Ohio, 162, *Taylor* v. *Miami Exp. Co.* It will be observed that in England and New York, in such cases, the Attorney General may sue, and, when others sue, he must be made a party. No such power exists, and no such course could, under any provision of our statutes, be pursued. If the persons interested can not sue, there appears no other remedy than the one taken in this case. It appears to be a matter of necessity. Such a relief is clearly contemplated in several English cases, and has been sustained in American authorities. See 2 Hare, 461, *Foss* v. *Harbottle;* 1 Phill. 790, *Mozley* v. *Alston;* 4 Hare, 290, *Lund* v. *Blanshard;* 2 Parsons Eq. Cas. 143. In view of these authorities, I feel bound to come to the conclusion that the plaintiff had a right to sue in a proper case.

The next and most important question in the case, is, whether the act of 1848 continued in force at the time the alleged contract purports to have been made.

It is not claimed that this act has ever been, in express terms, repealed. A repeal, by implication, is claimed to result, not only from the provisions of the schedule to the constitution, but also from subsequent legislative enactments. The rules as to repeals by implication, so strongly

laid down in 2 Ohio St. 607, *Cass* v. *Dillon*, show to my mind, conclusively, that there is no ground to claim any such repeal in this case, unless section 26 of article 2 of the constitution has altered the rules of construction as to repeals by implication. That section provides that "all laws of a general nature shall have a uniform operation throughout the State."

Whether this provision had the effect to abolish laws of a general nature, the operation of which was confined to particular counties, or to remove from counties, excepted from the operation of general laws, such exception, or whether the provision was directory as to future legislation, it is not, perhaps, necessary to inquire. The important inquiry is, what is meant by laws of a general nature, or, rather, whether the particular law in question is embraced in that description? Any other inquiry would be only in illustration or aid of the principal one.

A distinction has been often taken between public and private acts, and also between general and local laws. The precise line between them has never been drawn, and few cases have arisen in which any effort has been made. There are several recent cases in England referring to this distinction. Whether an act is to be deemed public or private, general or local, might, to some extent, depend on the intention of the legislature in its passage; and, in order to discover this intention, the classification made in publishing the act might be examined. 15 Mees. & Wels. 251, *Richards* v. *Easto*.

But surely this classification can not control, nor properly influence the question whether the law be of a general or a local and personal nature. A public and general law may be of a local or personal nature, and so a law of a general nature might be made local, the very evil in view of section 26, article 2, of the constitution. There appears to be a clear distinction between a general law and a law of a general nature. It might be in the power of the legislature to confer on many laws the form of a general law; but the nature of a law, whether general or local and special, is

inherent in the law itself, and a matter which the legislature can neither give nor take away by the manner in which it is passed or published. Whether, therefore, any law be a law of a general nature, will depend on the provisions of the law, and be a matter of judicial construction. It is a question which may, in some cases, present considerable difficulty; and it would be, perhaps, dangerous to attempt any general definition of what are laws of a general nature.

There is one guide in determining what are laws of a general nature, afforded by the section of the constitution under consideration. The laws of a general nature are intended to have a uniform operation throughout the State. Laws, therefore, which, from their nature, can not operate uniformly throughout the State, can not be embraced under the expression of laws of a general nature. The legislature may provide, by general laws, for matters in their nature local. Indeed, as to some matters, the legislature, it has been supposed, are required so to do by the constitution; as in the case of the organization of cities and villages. However general some of the laws on this subject are in form, they are, in their nature, essentially special, and must, of necessity, be local and partial in their operation.

And here, it must be remembered, that, except as to some specified matters, the legislature is not prohibited from passing local and special laws, as to matters in their nature local and special. The prohibition is not to confine a law, in its nature general, to a particular locality; or not to except from the operation of a law of a general nature a particular locality. If, therefore, any subject-matter is, in its nature, local, requiring special legislation, section 26, article 2, does not prohibit special legislation on that subject. The legislature is not required to provide for every local and special matter, by general laws, whenever it can be done, but are prevented from restricting the operation of laws of a general nature to any part of the State less than the whole. Such laws, when enacted, are to have a

uniform operation throughout the State; their operation can not be confined to one county or to fifty counties.

It will be observed that the first clause of section 26, article 2, speaks of the operation of laws; the second clause, of the taking effect of acts passed by the general assembly. These two clauses have no necessary connection, and one gives no aid in the construction of the other. The history of their introduction into the constitution shows that they were derived from distinct sources. The operation, in the first clause, is not the taking effect in the second. The first clause refers to laws, pre-supposing the act to have taken effect, and regulates its operation as a law; the second clause is directory as to acts—things not yet laws.

As said in reference to the term "laws of a general nature," so with the term "uniform operation," it would be difficult to give any satisfactory general definition. It is not confined to the taking effect and being a law throughout the State, for every law may be said to have that operation. Is it sufficient that it may operate uniformly at the discretion of different and distinct bodies throughout the State? In other words, is a mere power to act upon subject-matters, in their nature distinct and different, though it may be of a like kind, the uniform operation of a law? Does the operation of the law consist in its effect on those who, by its means, are affected in person or estate, or in the grant of a power to produce the effect? If a like power be given to bodies created for the purpose in all the counties of the State; but the exercise of the power depends on the discretion of those bodies, and in some counties, it may. be exercised, and in some it may not; in some counties it may be exercised to a certain extent, and in others to a different extent, involving heavy burdens upon the people, or light, as the discretion of those acting under the power shall determine. Does the operation of the law consist in the grant of power, or its exercise? If in the latter, it seems clear that such a law is not one having a uniform operation throughout the State. From its nature it can not have a

uniform operation; and if so, then it can not be a law of a general nature, within the meaning of the constitution. It may be a general law because, in general terms, and by a general description, applicable to all, it confers powers upon distinct bodies of men; but as these bodies of men may, and indeed, in many cases of necessity must, exercise the power differently and to a different extent, and with different effect on those to be affected, it is not a law of a general nature.

It appears to me that laws conferring power on the county commissioners to erect public buildings, fall within the above reasoning, and can not be considered laws of a general nature, having a uniform operation throughout the State. Laws regulating those matters in the government of the counties of a State, in their nature different, depending on taste and discretion, as to which no uniform rule can be prescribed, must be, in their nature, special. In the absence of any express provision of the constitution, that the counties of the State shall be governed alike, by the same general laws, I can see no reason why special laws for the purpose may not be passed. If special laws on the subject can be passed, then no general law that is passed, is, necessarily, a law of a general nature. Undoubtedly, laws having for their object the regulation of the counties of the State may be of a general nature, and have a uniform operation. In the same act, one part may contain a law of that description, and another part a law in its nature special. As, if the improper use of county funds by commissioners was made an offense punishable by fine and imprisonment, it would certainly be improper to limit the operation of this provision to particular counties; and yet I can see no room to doubt, in consideration of greater labor and responsibility, the compensation allowed to commissioners in one county might be fixed at a larger amount than in other counties.

I think the conclusion to which I have arrived, is sustained by the remarks of the Supreme Court in 2 Ohio St. 616, *Cass* v. *Dillon*. In those remarks, it will be observed that the court puts, by way of example, a law as to the jail of

Hamilton county, as not being a law of a general nature, and not repealed by the constitution. Had it been a law of a general nature, being confined to one county, the court seems to have supposed that the constitution itself would have operated its repeal. That view being correct, the case is strong authority to sustain the conclusion that the act of 1848 has never been repealed by implication.

I am entirely satisfied, the provision of the constitution having no effect to change the rule of construction, that no intention has ever been, in any manner, expressed by the legislature to repeal the act of 1848. That act, and the general law conferring a grant of power, may well stand together. One gives the power, the other regulates and restricts the mode of its exercise.

There is an objection to relief to the plaintiff, Ruffner, on a ground which may, perhaps, be inferred from the statements in the petition, and, very probably, did exist, in point of fact. The petition states that the commissioners are erecting a public building, called the "Asylum of Lunatics," near Carthage. Then follows the statement of the contract for the brick-work with the defendant, Hawkins. It may be very fairly inferred that the plaintiff was cognizant of the commencement of the building, and probably assented thereto. Then, undoubtedly, was the time to take the objection, that there had been no submission to the people of the question whether the building, the cost of which would exceed $5,000, should be constructed. One occupying the position of the plaintiff, assenting or acquiescing in the construction of the building as a whole, could not be properly heard afterward to object, on such a ground, to a contract for a portion of the work, and ask for his relief the extraordinary remedy by injunction.

Had this objection been taken, and anything like such a state of fact been presented, in our opinion, the petition should have been dismissed. But such an objection, I think, at least on the final hearing, should appear to have been taken by answer. This apparent acquiescence, or inferred consent, might probably have been explained. It was properly a mat-

ter of defense. It is not so stated in the petition as to make a part of the case of the plaintiff. It is a mere matter of inference, and the statement of it by way of inducement. The substantial facts are, that the building to be erected will exceed in cost $5,000; that no question as to the policy of the expenditure has been submitted to a vote of the people; that the contract is, therefore, unauthorized and void, and the expenditure of the money, proposed by the board of commissioners, will be a breach of their trust and duty, and an excess of their power, leading to a heavy burden and charge on the plaintiff, and those for whom he sues. This makes out a case for relief upon the demurrer. We have no right to look to a ground of defense inferentially appearing, and which was not relied on by the defendants.

Under these views, in my opinion, the judgment must be affirmed.

Judgment affirmed.